IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HINKLE FAMILY FUN CENTER, LLC,
BRYAN HINKLE, and DOUGLAS HINKLE,

   Plaintiffs,

              No. 20-CV-01025-MV-KK

  vs.

MICHELLE LUJAN GRISHAM,
Individually, Acting Under the Color of Law,
and KATHYLEEN M. KUNKEL,
Individually, Acting Under the Color of Law,

   Defendants.

## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** comes before the Court on Defendants' Motion to Dismiss Plaintiffs'

2nd Amended Complaint ("Motion to Dismiss") [Doc. 17] and Plaintiffs' Opposed Second

Motion to File Third Amended Complaint ("Motion to Amend") [Doc. 37].  The Court, having

considered the motions and the relevant law, finds that Defendants' Motion to Dismiss is well-

taken and will be granted, and Plaintiffs' Motion to Amend is not well-taken and will be denied.

## BACKGROUND

*Facts*

  Since its emergence last year, the novel coronavirus 2019, or Sars-CoV-2, the virus that

causes COVID-19, has spread exponentially through the world, and New Mexico has been no

exception.  Doc. 17 at 2.  The ease and rapidity with which COVID-19 spreads and its potentially

severe symptoms create a frightening potential for mass deaths and an overloaded healthcare

system.  *Id.* at 4.  As of February 4, 2022, over 75 million people have been infected with

1

COVID-19 in the United States, with over 880,000 related deaths, and the New Mexico Department of Health has reported over 480,000 positive COVID-19 cases and 6,500 related deaths in New Mexico.  February 4, 2022 Public Health Order, at 1 ("February 2022 PHO"), https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (hereinafter referred to as "NM Health Website").

As COVID-19 reached the state of New Mexico, on March 11, 2020, Governor Michelle Lujan Grisham declared a Public Health Emergency under the Public Health Emergency Response Act and invoked her authority under the All Hazards Emergency Management Act. *See* Executive Order 2020-004, NM Health Website.  At that time, the Centers for Disease Control and Prevention ("CDC") advised that "COVID-19 spreads easily through close person-to-person contact, and [that] the risk of transmission increases if individuals interact with more people, come within six feet of one another, and spend longer periods of time together."  Doc. 17 at 3.  In keeping with this advice and pursuant to the Governor's declaration, on March 23, 2020, the New Mexico Department of Health ("DOH"), issued a public health order ("March 2020 PHO"), in which it explained that "social distancing [was] the sole way New Mexicans [could] minimize the spread of COVID-19" and [then] constitute[d] the most effective means of mitigating the potentially devastating impact of this pandemic in New Mexico."  Doc. 15-2.  To ensure social distancing and thereby further the stated goal of mitigating the spread of COVID-19, the March 2020 PHO closed all businesses and non-profit entities, except those deemed essential, and placed restrictions on mass gatherings.  *Id.*  On June 1, 2020, the DOH issued a public health order ("June 2020 PHO") amending, *inter alia*, the March 2020 PHO to allow certain non-essential businesses to open with maximum occupancy requirements.  Doc. 15-3.

Under the June 2020 PHO, "recreational facilities" were required to remain closed.  *Id.* at 6.  The

June 2020 PHO expired by its own terms on June 30, 2020.  *Id.*

On July 1, 2020, Governor Lujan Grisham issued Executive Order 2020-054 ("July EO"),

indicating that "[m]any of the current confirmed positive cases of COVID-19 in New Mexico

have resulted from interstate and international travel to New Mexico via airplane," and that

because "some individuals infected with COVID-19 are asymptomatic or have very mild

symptoms, travelers may be unaware they are carrying the virus."  Doc. 15-5.  For this reason,

the July 2020 EO required, with certain exceptions, "persons arriving in New Mexico from out

of state [to] self-isolate" for a period of at least 14 days "or for the duration of their presence in

the State, whichever is shorter."  *Id.* at 1-2.

Following emerging CDC guidance, the DOH issued a public health order on July 13,

2020 ("July 2020 PHO"), indicating that both "social distancing *and* the consistent and proper

use of face coverings in public spaces [were] the most effective ways New Mexicans [could]

minimize the spread of COVID-19."  Doc. 15-4 at 2 (emphasis added).  Accordingly, the July

2020 PHO amended, *inter alia,* the June 2020 PHO, continued occupancy limitations for certain

businesses, ordered that "recreational facilities" remain closed, and required that, with certain

exceptions, "all individuals shall wear a mask or multilayer cloth face covering in public settings

except when eating, drinking, or swimming."  *Id.* at 6-9.  The July 2020 PHO expired by its own

terms on July 30, 2020.

Meanwhile, efforts were underway to develop a vaccine against COVID-19.  In

December 2020, the FDA granted emergency use authorizations ("EUA") for the

Pfizer/BioNTech ("Pfizer") two-dose mRNA vaccine for individuals 16 and older and for the

Moderna two-dose mRNA vaccine for individuals 18 and older.  *See* FDA News Release (Dec.

3

11, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19; FDA News Release (Dec. 18, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-additional-action-fight-against-covid-19-issuing-emergency-use-authorization-second-covid.  In February 2021, the FDA granted EUA for the Johnson & Johnson vaccine for individuals 18 and older.  FDA News Release (Feb. 27, 2021), https://www.fda.gov/news-events/press-announcements/fda-issues-emergency-use-authorization-third-covid-19-vaccine.  In May 2021, Pfizer's vaccine received EUA for individuals 12 and older, and then in August 2021, full FDA approval for individuals 16 and older.  *See* FDA News Release (May 10, 2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use; FDA News Release (August 23, 3021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.  In October 2021, the FDA authorized the emergency use of Pfizer's vaccine for children five through 11 years of age. *See* FDA News Release (Oct. 29, 2021), https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age. In November 2021, the FDA amended the EUA for both the Moderna and Pfizer vaccines, authorizing use of a single booster dose for all individuals 18 years of age and older after completion of primary vaccination with any FDA-authorized or approved COVID-19 vaccine. *See* FDA News Release (Nov. 19, 2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-expands-eligibility-covid-19-vaccine-boosters. In December 2021 and January 2022, the FDA again amended the EUA for the Pfizer vaccine, expanding authorization of booster doses to 12 to 17 years of age, at least five months after completion of primary vaccination with the Pfizer vaccine.  *See* FDA News Release (Dec. 9,

2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-expands-eligibility-pfizer-biontech-covid-19-booster-dose-16-and-17; FDA News Release (Jan. 3, 2022), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-multiple-actions-expand-use-pfizer-biontech-covid-19-vaccine.

With the first EUAs for covid vaccines, "New Mexico put into motion one of the most efficient vaccine rollouts in the United States."  Simon Romero, *How New Mexico Became the State with the Highest Rate of Full Vaccinations*, The New York Times (Apr. 14, 2021), https://www.nytimes.com/2021/04/14/us/new-mexico-covid-vaccines.html.  "Going into the pandemic with a dearth of financial resources compared with richer states, and vulnerabilities like having fewer hospital beds per capita than nearly every other state, the authorities in New Mexico saw the vaccine as their most powerful weapon to stave off an even more harrowing crisis."  *Id.*   By April 2021, New Mexico had reached the second highest vaccination rate in the United States.  *Id.*

As the number of vaccinated New Mexicans grew and scientific studies showed that the vaccines were safe and effective in preventing severe illness, Governor Lujan Grisham and the DOH began to lift restrictions on businesses and travel into the state, and to shift pandemic mitigation strategies toward vaccine and mask mandates.  Specifically, on November 27, 2020, the State announced that, "[i]n an effort designed to provide local communities the flexibility to operate more day-to-day activities," it would "transition to a tiered county-by-county COVID-19 risk system on Dec. 2, enabling local communities to shed burdensome restrictions as soon as public health data show the virus is retreating within their borders."  Office of the Governor Press Release (Nov. 27, 2021), https://www.governor.state.nm.us/2020/11/27/state-announces-tiered-red-to-green-system-for-n-m-counties-in-next-phase-of-covid-19-response.  Under the

5

"red to green" framework, a succession of public health orders rescinded prior public health orders and allowed, *inter alia*, outdoor and indoor recreational facilities to reopen and operate at reduced but increasing capacities commensurate with each county's decrease in COVID-19 case incidence rates and percentage of positive COVID-19 test results and increase in vaccination rates.  *See generally,* Public Health Orders (Nov. 30, 2020 to June 30, 2020), NM Health Website.  Additionally, noting that "the infection rate of COVID-19 in New Mexico has decreased since the distribution of vaccines was initiated," Governor Lujan Grisham issued Executive Order 2021-006 ("February 2021 EO") on February 10, 2021, rescinding the July 2020 EO and ending the quarantine requirements for individuals traveling into the State. Executive Order 2021-006, NM Health Website.

In April 2021, Governor Lujan Grisham announced that when "60 percent of eligible New Mexicans ha[d] been fully vaccinated," the State would "graduate out of the color-coded county risk system and remove most pandemic-related restrictions on commercial activities." Office of the Governor Press Release (Apr. 28, 2021), https://www.governor.state.nm.us/2021/04/28/new-mexico-to-loosen-red-yellow-green-criteria-sets-vaccination-goal-for-removal-of-restrictions/.  She indicated that "this target" was "made possible by New Mexico's nation-leading vaccination effort." *Id.*  In keeping with that announcement, effective July 1, 2021, the State "retire[d] its color-coded, county-by-county system and all COVID-19 health restrictions on commercial and day-to-day activity."  Office of the Governor Press Release (June 18, 2021), https://www.governor.state.nm.us/2021/06/30/n-m-to-lift-pandemic-restrictions-thursday/. Accordingly, on July 1, 2021, "all pandemic-related occupancy restrictions on all forms of commercial activity [were] lifted," and "[a]ll businesses across the state," including recreational facilities, have since been able "to operate at 100 percent of maximum capacity."  Office of the

Governor Press Release (June 30, 2021), https://www.governor.state.nm.us/2021/06/30/n-m-to-lift-pandemic-restrictions-thursday/.

Quickly following the reopening of New Mexico, the "highly transmissible" Delta variant emerged, soon accounted for virtually all new infections, and caused a "significant increase in new COVID-19 cases."  August 17, 2021 Public Health Order ("August 2021 PHO") at 1, NM Health Website.  In response to the rising tide of cases, rather than restrict businesses or travel into the state, the State imposed vaccine and/or testing mandates on certain categories of individuals, namely, school staff, congregate care facility workers, hospital workers, and employees of the Office of the Governor.  *Id.*  The August 2021 PHO grounded these vaccine/testing mandates on scientific evidence that: "the currently available COVID-19 vaccines are safe and the most effective way of preventing infection, serious illness, and death"; "widespread vaccination protects New Mexico's health care system as vaccines decrease the need for emergency services and hospitalization"; and "the refusal to receive the COVID-19 vaccine not only endangers the individual but the entire community, and further jeopardizes the progress the State has made against the pandemic by allowing the virus to transmit more freely and mutate into more transmissible or deadly variants."  *Id.* at 1-2.  At the same time, Governor Lujan Grisham re-implemented the statewide requirement that face masks be worn in all public indoor spaces, regardless of vaccination status.  *Id.*  Noting that face masks "are effective in limiting the spread of the more transmissible 'Delta' variant," and that "proper use of face coverings in public spaces" is one of "the most effective ways New Mexicans can minimize the spread of COVID-19 and mitigate the potentially devastating impact of this pandemic in New Mexico," Governor Lujan Grisham and the DOH extended the mask requirement in a series of

public health orders.  *See* Public Health Orders (Sept. 15, 2020 - Feb. 4, 2022), NM Health Website.

While New Mexico was still experiencing a "significant increase in new COVID-19 cases" as a result of the Delta variant, the CDC identified yet another new variant of concern, "Omicron."  NMDOH Press Release (Dec. 13, 2021), https://cv.nmhealth.org/2021/12/13/state-identifies-first-omicron-covid-19-case/.  On December 13, 2021, the DOH announced its first identified case of the Omicron variant in New Mexico.  *Id.*  In the face of the newly discovered variant, Governor Lujan Grisham and the DOH issued a public health order mandating that certain individuals, including health care and congregate care workers, receive booster vaccines, and a public health order extending the mask mandate.  *See* December 10, 2021 Public Health Order, October 10, 2021 Public Health Order, NM Health Website.  The February 2022 PHO, which is currently in effect, continues to require that masks be worn "in all indoor public settings except when eating or drinking," but does not require the closure of, or impose occupancy restrictions on, recreational facilities or any other type of business.  February 2022 PHO, NM Health Website.

*Procedural History*

On October 7, 2020, Plaintiffs Hinkle Family Fun Center, LLC, Brian Hinkle, and Douglas Hinkle commenced the instant action by filing their Verified Complaint for Civil Rights Violations Under the Fourteenth Amendment to the United States Constitution and Request for Temporary Restraining Order ("TRO").  Doc. 1.  Plaintiffs named Governor Lujan Grisham and Kathyleen Kunkel, then-Secretary of the State of New Mexico Department of Health, "individually" and "acting under the color of law," as Defendants.  *Id.*  On October 8, 2020, the Court entered an Order finding no grounds to issue the requested TRO on an *ex parte* basis

without notice to Defendants but did order an expedited briefing schedule on the TRO request.
Doc. 3.

On October 8, 2020, Plaintiffs filed an amended complaint, adding Albuquerque Urban
Air, LLC, Thomas Garcia, Brian Garcia, and Justin Hays as Plaintiffs.  Doc. 4.  On October 27,
2021, Plaintiffs filed their Second Amended Complaint ("SAC"), adding Cliff's Amusement
Park and Justin Hays as Plaintiffs.  Doc. 15.  In the SAC, Plaintiffs claim that, in enacting the
March 2020 PHO, June 2020 PHO, and July 2020 PHO, all of which required recreational
facilities (including Plaintiffs Hinkle Family Fun Center, Albuquerque Urban Air and Cliff's
Amusement Park) to remain closed, and the July 2020 EO, which restricted travel into New
Mexico, Defendants violated Plaintiffs' substantive due process, procedural due process, and
equal protection rights under the Fourteenth Amendment of the United States Constitution.  Doc.
15 at 5-9.  As a result of these alleged violations, Plaintiffs request a declaratory judgment that
the March 2020 PHO, June 2020 PHO, July 2020 PHO, and July 2020 EO (collectively, the
"Challenged Orders"), in "requir[ing] businesses to remain closed[, are] unconstitutional," and a
TRO, preliminary injunction, and permanent injunction prohibiting "Defendants from enforcing"
the Challenged Orders "in the arbitrary and capricious manner and fashion . . . that keeps
businesses like Plaintiffs' closed and unable to even open under similar conditions and
restrictions as other businesses."  *Id.* at 9-10.

After completion of briefing on Plaintiffs' request for temporary relief in accordance with
the schedule set in the Court's October 8, 2020 Order, Plaintiffs advised the Court by email
message that they intended to file a motion for preliminary injunction separate and apart from the
request for interim relief set forth in the SAC.  Plaintiffs asked the Court to hold in abeyance its
decision on their request for interim relief until such briefing was completed.

9

On November 5, 2020, Defendants filed the instant Motion to Dismiss, Doc. 17, to which Plaintiffs filed a response in opposition on November 18, 2020.  Doc. 19.  Defendants' reply followed on December 3, 2020.  Although on June 8, 2021 Plaintiffs filed an opposed motion to amend the SAC, they withdrew that motion on July 6, 2021.  Doc. 33.

Noting that none of the Challenged Orders remains in effect, and that all businesses in New Mexico, including recreational facilities, have been permitted to operate at full capacity since July 1, 2021, the Court entered an Order on September 23, 2021, indicating its concern that Plaintiffs' claims are moot and that, as a result, this Court no longer has subject matter over the instant action.  Doc. 36.  To address this concern, the Court ordered briefing from the parties as to this discrete issue.  *Id.*  Briefing from both parties followed.  Doc. 38; 39.

After the Court raised the specter of mootness, on September 23, 2021, Plaintiffs filed their Motion to Amend, seeking leave to file a third amended complaint.  Doc. 37.  Specifically, Plaintiffs seek to add a request for relief in the form of damages on their Fourteenth Amendment claims, and to add an additional claim, namely, that the Challenged Orders constitute a "taking" in violation of the Fifth Amendment of the United States Constitution.  Doc. 37.  Defendants filed a response in opposition to Plaintiffs' Motion to Amend on October 7, 2021, Doc. 40, and Plaintiffs' reply followed on October 21, 2012.  Doc. 41.

## DISCUSSION

The SAC is currently the operative document in this matter.  According to Defendants, the SAC should be dismissed for lack of jurisdiction because Plaintiffs' claims are moot or, in the alternative, for failure to state a claim.  Plaintiffs seek leave to amend the SAC, which, if granted, would render moot Defendants' arguments in favor of dismissal, as a third amended complaint would replace the SAC as the operative document in this matter.  For the reasons set

forth herein, the Court finds that it would be futile to grant Plaintiffs leave to amend the SAC, and that, because the claims set forth in the SAC are moot, the SAC must be dismissed for lack of jurisdiction.

I.     Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that, when a party seeks leave to amend, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Court, however, need not grant leave to amend "where amendment would be futile."  *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.,* 175 F.3d 848, 859 (10th Cir. 1999); *Foman v. Davis,* 371 U.S. 178, 182 (1962).  "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal."  *Jefferson Cty.*, 175 F.3d at 859. Accordingly, this Court has discretion to deny Plaintiffs' Motion to Amend if the claims that they seek to add to their SAC are insufficient. *Id.*  As explained herein, the Court finds that amendment would be futile because Defendants would be entitled to qualified immunity on any request for damages in connection with Plaintiffs' due process claims, and because Plaintiffs' proposed takings claim would be subject to dismissal in its entirety for failure to state a claim.

A.     Qualified Immunity Would Bar a Damages Claim Against Defendants

The SAC seeks declaratory and injunctive relief for Defendants' alleged violations of Plaintiffs' constitutional rights.  Plaintiffs seek leave to amend to add a request for "actual and punitive damages" for those alleged violations.  Doc. 37-1 at 11.  But, as Defendants argue, any claims for damages are cognizable only against them in their individual capacity.  *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive

11

relief."). And, as set forth herein, Defendants would be entitled to qualified immunity on any claims against them in their individual capacity.

"The doctrine of qualified immunity shields [governmental officials] from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) (citation omitted). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (citation omitted). Although the Supreme Court's "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 7-8. Moreover, "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 8. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Plaintiffs have provided no precedent[1], and the Court has found none, to suggest that Defendants violated any clearly established right by enacting the Challenged Orders – two of which imposed temporary restrictions on recreational facilities and one of which imposed temporary restrictions on travel – in an effort "to address th[e] extraordinary health emergency" created by the COVID-19 pandemic. *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (denying application to enjoin enforcement of California order that, to

---

[1] Indeed, in their reply brief, Plaintiffs do not mention, much less provide any response in opposition to, Defendants' argument that they would be entitled to qualified immunity on Plaintiffs' proposed damages claims.

limit spread of COVID-19, placed temporary numerical restrictions on public gatherings). Indeed, the Supreme Court has expressly held that "the precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," and that where, as here, "local officials are actively shaping their response to changing facts on the ground," "[t]he notion that it is 'indisputably clear' that the Government's limitations are unconstitutional seems quite improbable." *Id.* at 1614.

Further, far from placing "beyond debate" any established right to be free from temporary, pandemic-related restrictions, controlling Supreme Court precedent instead instructs that: the "Constitution principally entrusts the safety and health of the people to the politically accountable officials of the States to guard and protect"; when "those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad"; and, unless those broad limits are "exceeded," "they should not be subject to second-guessing by an unelected federal judiciary." *Id.* at 1613-14 (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Marshall v. United States*, 414 U.S. 417 (1974); *Garcia v. San Antonio MTA*, 469 U.S. 528 (1985)). Thus, while there is no established precedent to suggest that Defendants' limitations were unconstitutional, there *is* established precedent to demonstrate that, in enacting the Challenged Orders, Defendants acted within the limits of their Constitutionally entrusted duty to guard and protect the safety and health of the people of New Mexico. *See Bojicic v. DeWine*, __ F. Supp. 3d __, No. 21-cv-630, 2021 WL 4977018, at *15 (N.D. Ohio Oct. 27, 2021) (noting that when the Director of the Ohio Department of Health issued orders closing non-essential businesses, "*Jacobson* endorsed the constitutionality of her having done so"). Given this binding precedent, "it is simply irrational to assert that a reasonable health official would

have known that imposing business closings in response to a pandemic clearly violated Supreme

Court precedent." *Id.*

Indeed, "courts around the country have addressed qualified immunity for government

officials at the 12(b)(6) stage regarding Covid-19 measures and found government officials to be

immune from suit in their personal capacities." *Pleasant View Baptist Church v. Beshear*, No.

20-cv-166, 2021 WL 4496386, at *8 (E.D. Kty. Sept. 30, 2021) ("After examining the applicable

precedent, particularly in light of a global pandemic, Pleasant View cannot demonstrate that

Governor Beshear's issuance of [an executive order temporarily halting in person learning]

violated a clearly established constitutional right, and qualified immunity will be granted on that

basis."). *See, e.g., Bojicic*, 2021 WL 4977018, at *15 (dismissing all monetary claims against all

defendants on basis of qualified immunity, and explaining that "[t]he numerous decisions

upholding such orders clearly demonstrate that a reasonable person in the Health Director's

position would not have 'known' that enacting the orders at issue here would violate the law");

*Benner v. Wolf*, No. 20-cv-775, 2021 WL 4123973, at *5 (M.D. Pa. Sept. 9, 2021) (dismissing

plaintiffs' federal damages claims on the basis of qualified immunity and explaining that,

"[w]hen Defendants imposed the challenged COVID-19 restrictions, no Supreme Court

precedent, Third Circuit precedent, or robust consensus or persuasive authority had held that

similar restrictions violated clearly established law"); *Northland Baptist Church of St. Paul,*

*Minn. v. Walz*, __ F. Supp. 3d __, 2021 WL 1195821, at *8 (D. Minn. Mar. 30, 2021) (finding

that it was "not clear that Governor Walz had fair warning that the [executive orders limiting the

number of people allowed in buildings] violated Plaintiffs' rights, if they in fact do so," and,

accordingly, dismissing claims against Governor Walz in his individual capacity on basis of

qualified immunity); *Case v. Ivey*, __ F. Supp. 3d __, 2021 WL 2210589, at *25-26 (M.D. Ala.

June 1, 2021) (granting qualified immunity to Governor Ivey in motion to dismiss context following litigation challenging her proclamation of a national emergency and subsequent orders intended to combat COVID-19); *Hartman v. Acton*, 499 F. Supp. 3d 523, 538 (S.D. Ohio 2020) (granting qualified immunity to Ohio Department of Health director in motion to dismiss context following issuance of stay at home order in response to COVID-19 pandemic).

Consistent with these decisions, the Court finds that "existing precedent did not clearly establish Plaintiffs' rights at the time of the alleged violations so as to put [Defendants'] conduct [in issuing the Challenged Orders] beyond debate." *Northland Baptist Church*, 2021 WL 1195821, at *8. Accordingly, Defendants would be entitled to qualified immunity on Plaintiffs' proposed claims against them in their individual capacity. For this reason, it would be futile to grant Plaintiffs leave to amend the SAC to add a claim for money damages against Defendants.

B.    Plaintiffs Cannot State a Takings Claim

Plaintiffs also seek leave to amend the SAC to add a new cause of action for "unlawful taking under the United States Constitution Fifth Amendment." Doc. 37-1 at 9. Specifically, Plaintiffs claim that, by enacting the Challenged Orders, Defendants imposed "a negative servitude prohibiting the entry of the public to Plaintiffs' business," and request "just compensation for the property taken by the Defendants acting individually under the color of law through the imposition of Public Health Orders." *Id.* at 6, 9.

As an initial matter, as Defendants argue, "takings actions sound against governmental entities rather than individual state employees in their individual capacities." *Langdon v. Swain*, 29 F. App'x 171, 172 (4th Cir. 2002); *see also Vicory v. Walton*, 730 F.2d 466, 467 (6th Cir. 1984) (holding that an individual cannot "commit, and be liable in damages for, a 'taking' under

the fifth amendment").[2]  Any proposed takings claim against Defendants in their individual

capacity thus would be subject to dismissal.  *Langdon*, 29 F. App'x at 172.  It follows that it

would be futile to allow Plaintiffs to amend the SAC to add a takings claim against Defendants

in their individual capacity.

It would be equally futile to allow Plaintiffs to amend the SAC to name Defendants in

their official capacity for purposes of their proposed takings claim.  "There are two distinct types

of takings:  per se physical takings and regulatory takings."  *KI Florida Props., Inc. v. Walton

Cty.*, No. 20-cv-5358, 2021 WL 5456668, at *3 (N.D. Fla. Oct. 15, 2021).  Physical takings,

which involve governmental appropriation of "private property for itself or a third party," are

governed by a "simple, *per se* rule:  The government must pay for what it takes."  *Cedar Point

Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).  In contrast, where the government "instead

imposes regulations that restrict an owner's ability to use his [or her] own property, a different

standard applies."  *Id.*  Specifically, "[t]o determine whether a use restriction effects a taking,"

the court generally applies "the flexible test" set forth in *Penn Central Transp. Co. v. New York

City*, 438 U.S. 104, 124 (1978), which balances "factors such as the economic impact of the

regulation, its interference with reasonable investment-backed expectations, and the character of

the government action." *Cedar Point*, 141 S. Ct. at 2072.

In *Cedar Point*, the Supreme Court clarified that whether a taking is a *per se* physical

taking or a regulatory taking does not depend on "whether the government action at issue comes

garbed as a regulation," but rather on "whether the government has physically taken property for

itself or someone else – by whatever means – or has instead restricted a property owner's ability

---

[2] In their reply brief, Plaintiffs fail to acknowledge that they have brought this action against Defendants only in their individual capacity, much less address the ramifications of that choice for their proposed takings claim.

to use his own property." *Id.*  Accordingly, "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place." *Id.* Applying this standard, the *Cedar Point* Court held that an "access regulation" that granted "union organizers a right to physically enter and occupy the growers' land for three hours per day, 120 days per year," "appropriates a right to invade the growers' property and therefore constitutes a *per se* taking." *Id.*

In their Motion to Amend, Plaintiffs argue that, under *Cedar Point*, the Challenged Orders effected a *per se* physical taking by "impos[ing] a servitude that required businesses be outright closed such that the public could not access the private property or later restricting the manner or hours in which the public could access that private property." Doc. 41 at 2.  This argument, however, fundamentally misunderstands the holding and rationale of *Cedar Point*.  As described above, the *Cedar Point* Court drew a bright-line distinction between a regulation that results in a physical appropriation of property and one that restricts an owner's ability to use its property.  Only the former is a *per se* physical taking; the latter is a regulatory taking, generally subject to the *Penn Central* balancing test.  And while Plaintiffs in fact quote from and emphasize the very language in *Cedar Point* drawing this distinction, *see* Doc. 41 at 2, Plaintiffs fail to grasp that this language places the Challenged Orders squarely outside the camp of a *per se* physical taking.

The *Cedar Point* Court found that the regulation at issue before it was a *per se* physical taking precisely because, "[r]ather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude." *Cedar Point*, 141 S. Ct. at 2072.  In contrast, the Challenged Orders at issue here "did not authorize an intrusion, even temporarily," or "take the property for use by the [state], the public, or anyone

else." *KI Florida Props.*, 2021 WL 5456668, at *5.  Indeed, quite to the contrary, the

Challenged Orders explicitly restrained Plaintiffs' use of their property.  Thus, far from

supporting their position, *Cedar Point* makes clear that the Challenged Orders did not effect a

*per se* physical taking.  *See KI Props.*, 2021 WL 5456668, at *5 (holding that, under *Cedar

Point,* ordinance temporarily restricting plaintiffs from accessing their beachfront property did

not effect a *per se* physical taking); *Skatemore, Inc. v. Whitmer*, No. 21-cv-66, 2021 WL

3930808, at *5 (W.D. Mich. Sept 2, 2021) (holding that *Cedar Point* and its rationale did not

apply where executive ordinances temporarily closed businesses, including plaintiffs' bowling

establishments).

Nor does the Court find that the Challenged Orders effected a regulatory taking requiring

compensation.[3]  "A regulatory taking occurs when private property rights are eliminated or

diminished through government regulation."  *KI Props.*, 2021 WL 5456668, at *5.  There are

two types of regulatory takings:  categorical takings, "in which the property owner is deprived of

all economically viable use of the property," and non-categorical takings, which include

"anything less and [are] subject to analysis under the [*Penn Central*] balancing test."  *Id.*

Categorical takings are limited to those "in which a regulation permanently deprives property of

all value."  *Tahoe-Sierra Pres. Council, Inc. v. Taho Reg'l Planning Agency*, 535 U.S. 302, 332

(2002).  Plaintiffs do not allege that the Challenged Orders permanently deprived their property

of all value and, indeed, acknowledge that they are no longer subject to any restrictions on the

use of their property.  *See* Doc. 37-1 at 4.  "A temporary restriction on use like the one at issue

---

[3] In seeking to amend the SAC to add a takings claim, Plaintiffs rely solely on the theory that the
Challenged Orders effected a per se physical taking under *Cedar Point* and do not address
whether, in the alternative, the Challenged Orders effected a regulatory taking requiring
compensation.  Nonetheless, the Court finds it prudent to address all alternatives in deciding
whether leave to amend should be granted.

here does not necessarily require compensation," but rather is subject to the *Penn Central*

balancing test. *Skatemore*, 2021 WL 3930808, at *4.

Under *Penn Central*, the Court weighs "(1) the economic impact of the regulation on the

property, (2) the property owner's reasonable investment-backed expectations for development,

and (3) the character of the government regulation." *KI Props.*, 2021 WL 5456668, at *5. "The

*Penn Central* test is driven by justice and fairness, and the outcome depends largely upon the

particular circumstances of the case." *Id.* (citation omitted). While Plaintiffs' allegations may be

sufficient to establish that the Challenged Orders had a significant economic impact on them,

they fall short of establishing that the remaining two factors tip the balance in their favor. As to

their investment-backed expectations, while "Plaintiffs understandably expected to conduct

business as usual when 2020 began, the pandemic forced everyone to adjust their expectations."

*Skatemore*, 2021 WL 3930808, at *4. "Plaintiffs cannot plausibly contend that they expected to

continue operating normally when doing so posed an obvious risk of spreading a contagious and

dangerous virus." *Id.* "All property in this country is held under the implied obligation that the

owner's use of it shall not be injurious to the community, and the Takings Clause did not

transform that principle to one that requires compensation whenever the State asserts its power to

enforce it." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 (1987)

(citations omitted).

Perhaps most importantly, "the character of the government action here strongly weighs

against a finding that the [Challenged Orders] require compensation." *Skatemore*, 2021 WL

3930808, at *4. The circumstances in which Defendants enacted the Challenged Orders "are

extraordinary and unprecedented." *KI Props.*, 2021 WL 5456668, at *5. In the throes of the

pandemic, Defendants "acted pursuant to a state declaration of emergency to protect public

health, and for a limited time." *Id.*  Thus, this is "a situation in which government officials 'reasonably concluded that the health, safety, [] or general welfare would be promoted by prohibiting particular contemplated uses of land.'" *Skatemore*, 2021 WL 3930808, at *4.  As noted above, "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens." *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (citation omitted).  It follows that "[a] prohibition simply upon the use of property for purposes that are declared . . . to be injurious to the health [] or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887).

Accordingly, the balance of the *Penn Central* factors weighs against a finding that the Challenged Orders effected a regulatory taking requiring compensation.  Plaintiffs' proposed takings claim, even if alleged against Defendants in their official capacity, thus would be subject to dismissal for failure to state a claim.  In reaching this conclusion, the Court is in accord with the many other courts that have dismissed "complaints alleging that closure orders and other business restrictions implemented in response to the pandemic constituted a taking under the Fifth Amendment." *Skatemore*, 2021 WL 3930808, at *5 (citing *TMJ 64, Inc. v. Harris,* No. 20-cv-2498, 2021 WL 863202, at *5 (W.D. Tenn. Mar. 8, 2021) (dismissing a Fifth Amendment takings claim challenging closure of limited-service restaurants); *Daugherty Speedway, Inc. v Freeland,* No. 20-cv-36, 2021 WL 633106, at *5 (N.D. Ind. Feb. 17, 2021) (same for closure of a racetrack); *Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 403 (S.D.N.Y. 2020) (same)); see also *KI Props.*, 2021 WL 5456668, at *5 (holding that orders temporarily restricting plaintiffs' access to their beach property in an effort to safeguard the community against COVID-19 was not an unconstitutional taking).  Because Plaintiffs would not be able to

state a takings claim, it would be futile to grant leave to amend the SAC to add such a claim against Defendants in their official capacity.

* * *

As the Court has concluded that it would be futile to grant Plaintiffs leave to amend the SAC either to add a damages claim against Defendants in their individual capacity or to add a takings claim against Defendants (in any capacity), Plaintiffs' Motion to Amend will be denied. Accordingly, the SAC remains the operative document in this matter.

## II.    <u>Mootness</u>

In their Motion to Dismiss, Defendants argue that the SAC should be dismissed for failure to state a claim. Before reaching the merits of that motion, however, this Court "must be sure of its own jurisdiction." *Krach v. Holcomb*, No. 20-cv-184, 2020 WL 2197855, at *2 (N.D. Ind. May 6, 2020) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)). "For this reason, an objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage of the litigation, even after trial and entry of judgment." *Krach*, 2020 WL 2197855, at *2 (citing *Arbach v. Y&H Corp.*, 546 U.S. 500, 506 (2006)).

Here, because none of the Challenged Orders remains in effect, the Court asked the parties to brief the issue of whether this Court lacks subject matter jurisdiction. Doc. 36. Plaintiffs argue that this Court continues to have jurisdiction over this matter. Doc. 38. Defendants disagree. Doc. 39. Guided by the principles that follow, the Court finds that the rescission, amendment, and/or expiration of the Challenged Orders render this case moot, thereby depriving this Court of jurisdiction.

A.    Standard

"Article III of the Constitution permits federal courts to decide only 'Cases' or

'Controversies.'"  *New Mexico Health Connections v. United States Dep't of Health & Human*

*Servs.*, 946 F.3d 1138, 1159 (10th Cir. 2019) (quoting U.S. Const. art. III, § 2).  "An actual

controversy must be extant at all stages of review, not merely at the time the complaint is filed."

*Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016) (citation omitted).  "If an intervening

circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point

during litigation, the action can no longer proceed and must be dismissed as moot."  *Id.*

"Mootness deprives federal courts of jurisdiction."  *Id.*

A case becomes moot if "the issues presented are no longer 'live' or the parties lack a

legally cognizable interest in the outcome."  *Id.*  In determining whether a case is moot, the

"crucial question is whether granting a present determination of the issues offered will have

some effect in the real world."  *Id.* at 1165-66.  In other words, "a case becomes moot when a

plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision."

*Id.* at 1166.

There are two exceptions to the doctrine of mootness – "situations in which a case

remains subject to federal court jurisdiction notwithstanding the seeming extinguishment of any

live case or controversy."  *Id.*  The first exception to mootness is where a case involves disputes

that are "capable of repetition, yet evading review."  *Id.*  This "exception applies where (1) the

challenged action is in its duration too short to be fully litigated prior to cessation or expiration,

and (2) there is a reasonable expectation that the same complaining party will be subject to the

same action again."  *Id.*  "[T]he plaintiff bears the burden of establishing the issue is a wrong

capable of repetition yet evading review." *Ind v. Colorado Dep't of Corr.*, 801 F.3d 1209, 1215 (10th Cir. 2015). "The exception is narrow and is only to be used in exceptional situations." *Id.* (citation omitted).

The second exception to mootness is "a defendant's voluntary cessation of an alleged illegal practice which the defendant is free to resume at any time." *Rio Grande Silvery Minnow v. Bureau of Reclamation,* 601 F.3d 1096, 1115 (10th Cir. 2010). This exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Id.* (citation omitted). Thus, "this exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct." *Id.* (citation omitted).

Notably, however, a defendant's voluntary cessation may moot a case "if two conditions are satisfied: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocable eradicated the effects of the alleged violation." *Id.* (citation omitted). The party asserting mootness has the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (citation omitted).

This burden, however, "is not insurmountable, especially in the context of government enforcement." *Brown*, 822 F.3d at 1167; *see also Rio Grande Silvery Minnow,* 601 F.3d at 1116 ("In practice, [this] burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case."). "Thus, even when a legislative body has the power to re-enact an ordinance or statute, ordinarily an amendment or repeal of it moots a case challenging the ordinance or statute." *Rio Grande Silvery Minnow*, 601 F.3d at 1116. In the context of governmental action, "most cases that deny mootness rely on *clear showings* of

reluctant submission [by government actors] and a desire to return to the old ways." *Id.* at 1117 (emphasis in original). Accordingly, the Tenth Circuit has held that, where a legislature has repealed or amended a statute after a judicial challenge has been commenced, "the voluntary-cessation exception has no application where there is no evidence in the record to indicate that the legislature intends to reenact the prior version of the disputed statute." *Id.* (citation omitted).

Similarly, "the withdrawal or alteration of administrative policies can moot an attack on those policies." *Id.* (citation omitted). "And the mere possibility that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy." *Id.* (citation omitted). To the contrary, "a case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency." *Id.* (citation omitted).

B.   The Instant Case

It is undisputed that the Challenged Orders are no longer in effect. Specifically, the March 2020 PHO was amended by the June 2020 PHO; the June 2020 PHO expired by its own terms on June 30, 2020; the July 2020 PHO expired by its own terms on July 30, 2020; and the July EO was rescinded by the February 2021 EO. Doc. 15-3; Doc. 15-4; February 2021 EO, NM Health Website. Further, on July 1, 2021, Defendants lifted "all pandemic-related occupancy restrictions on all forms of commercial activity" and, since that date, "all businesses across the state," including Plaintiffs' recreational facilities, have been able "to operate at 100 percent of maximum capacity." Office of the Governor Press Release (June 30, 2021), https://www.governor.state.nm.us/2021/06/30/n-m-to-lift-pandemic-restrictions-thursday/. Similarly, on February 10, 2021, the Governor ended the quarantine requirements for individuals traveling into the State. February 2021 EO, NM Health Website.

Thus, as of February 10, 2021, there have been no restrictions on travel into the State, and since at least July 1, 2021, there have been no restrictions that require Plaintiffs' businesses to remain closed while others are permitted to be open, that shut down Plaintiffs' businesses without notice and an opportunity to be heard, or that ease restrictions on some businesses but not others. *See* Doc. 15 at 5-9. And in the absence of any such restrictions, the substantive due process, procedural due process, and equal protection issues presented by Plaintiffs are no longer "live." Because neither the Challenged Orders nor any other orders are currently in effect that restrict the operation of their recreational facilities or the ability of their potential clientele to patronize those facilities, Plaintiffs "no longer suffer[] actual injury that can be redressed by a favorable judicial decision." *Brown*, 822 F.3d at 1166. Accordingly, the instant case has become moot.

Plaintiffs argue that the first exception to the doctrine of mootness applies here, namely, that the dispute at issue is capable of repetition, yet evading review. Doc. 38 at 2. In support of this argument, Plaintiffs note that "the Governor's emergency declarations remain in effect along with Public Health Orders (PHO) that limit or prohibit public attendance to events such as the State Fair," and that it "is entirely plausible and highly likely that if the Delta Variant continues to pose complications[,] the next set of PHO's will again include requirements that limit or prohibit attendance by the public to the businesses of these Plaintiffs." *Id.* at 2. The Court is not convinced.

First, Plaintiffs fail to address, much less establish, whether the Challenged Orders were in their duration too short to be fully litigated prior to their cessation or expiration. Accordingly, Plaintiffs fail to meet the first requirement of the "capable of repetition" exception to the mootness doctrine. Further, Plaintiffs have done no more than point to the fact that Defendants

25

"still claim[] the power to issue orders of the sort" challenged here and speculate, without providing any basis for that speculation, as to the content of future orders. *County of Butler v. Governor of Penn.*, 8 F. 4th 226, 231 (3rd Cir. 2021). This is not sufficient to meet the second requirement of the "capable of repetition" exception, namely, that Plaintiffs show a *reasonable likelihood* that they will be subject again to the same limitations imposed in the Challenged Orders. *Id.*

As detailed above, at the beginning of the pandemic – before there were vaccines – the science-driven data indicated that COVID-19 spread easily through close person-to-person contact, and that the risk of transmission increased if individuals interacted with more people, came within six feet of one another, and spent longer periods of time together. Given this data, Defendants determined that social distancing was the *only* way to minimize the spread of COVID-19, and at that time, was the *most effective means* of mitigating the potentially devastating impact of the pandemic in New Mexico. In accordance with these determinations, Defendants enacted a series of orders that first closed non-essential businesses, and then gradually allowed such businesses to open with occupancy restrictions, along with an order that required a period of quarantine for travelers entering New Mexico. Those early orders included the Challenged Orders, pursuant to which Plaintiffs' recreational facilities were required to remain closed.

As the science evolved and the vaccines were developed, approved, and made available to the public, it became clear that the consistent and proper use of face masks was *one of the most effective ways* to minimize the spread of COVID-19, and that the vaccines are safe and *the most effective way* of preventing infection, serious illness, and death, even in the face of the Delta and Omicron variants. In accordance with the science, Defendants refocused their

26

pandemic mitigation strategies away from restricting businesses and travel, and toward the vaccination rollout, which they saw as "their most powerful weapon," and mask mandates. Indeed, as early as November 2020, Defendants announced the transition to the tiered county-by-county COVID risk system, with the specific purpose of enabling local communities to shed burdensome restrictions as soon as the virus began to retreat within their borders.  Under the "red to green" framework, a succession of public health orders rescinded prior public health orders and allowed, *inter alia*, outdoor and indoor recreational facilities to reopen and operate at reduced but increasing capacities commensurate with each county's decrease in COVID-19 case incidence rates and percentage of positive COVID-19 test results and increase in vaccination rates.  In February 2021, the Governor ended the quarantine requirements for travelers, thus making it possible for businesses, like Plaintiffs, to once again welcome out-of-state clientele.

Tying reopening to vaccination rates, once 60 percent of eligible New Mexicans had been fully vaccinated, the State ultimately retired its color-coded, county-by-county system and all COVID-19 health restrictions on commercial and day-to-day activity.  Thus, as of July 1, 2021, all pandemic-related occupancy restrictions on all forms of commercial activity were lifted, and all businesses across the state, including recreational facilities, have since been able to operate at 100 percent of maximum capacity.

Quickly following the reopening of New Mexico, the highly transmissible Delta variant emerged, soon accounted for virtually all new infections, and caused a significant increase in new COVID-19 cases.  In response to the rising tide of cases, Defendants did not reverse course and reimpose restrictions on businesses or travel into the state.  Rather, in keeping with their science-driven determinations that vaccines and masks are the most effective means of limiting the spread of COVID-19, Defendants imposed vaccine and/or testing mandates on certain

27

categories of individuals.  And even with the startling ascendency of the Omicron variant and the skyrocketing numbers of infections and hospitalizations it has caused, Defendants have not reversed course and reimposed restrictions on businesses or travel into the state.  Rather, Defendants have extended the mask requirement, and have mandated that certain individuals receive booster vaccines.

Thus, despite "complications" from not only the Delta variant but also the Omicron variant, Plaintiffs' prediction that future public health orders will "again include requirements that limit or prohibit attendance by the public to the businesses of these Plaintiffs" has not come to pass.  To the contrary, the trajectory of Defendants' response to COVID-19 has consistently moved away from restrictions on businesses and travel and toward vaccine and mask mandates. Given this trajectory, coupled with the scientific basis for that trajectory showing that masks and vaccines, rather than business closures, are the most effective means of containing the spread of COVID-19, there is no reasonable expectation that Defendants will reverse course and subject Plaintiffs to restrictions akin to those imposed under the now-defunct Challenged Orders.  *See Hawse v. Page,* 7 F. 4th 685, 692-93 (8th Cir. 2021) (finding moot challenge to pandemic-related order limiting religious gatherings to fewer than 10 persons, noting that the "disputed order was superseded in May 2020 in light of changing public health conditions," that circumstances, including the "emerging availability of vaccines," have "evolved substantially since then," and that, "[a]lthough the emergence of the Delta variant of the coronavirus led the County on July 26, 2021, to require the use of face coverings at indoor and enclosed public buildings and spaces, there are no gathering restrictions in effect"); *Illinois Republican Party v. Pritzker*, No. 20-cv-3489, 2021 WL 4077624, at *3 (N.D. Ill. Sept. 7, 2021) (finding moot challenge to pandemic-related gathering limits despite plaintiffs' argument that no guarantee existed that the

government would not impose new gathering limits in response to a surge in COVID-19 cases, where the gathering limits ended five months earlier, and where the Governor, "to address the most recent surge, instead of imposing gathering limits," "reimposed an indoor mask mandate and required vaccinates for [certain individuals]"); *Spell v. Edwards*, 962 F.3d 175, 180 (5th Cir. 2020) (finding that plaintiffs failed to establish that the Governor "might reimpose another gathering restriction on places of worship" where the "trend in Louisiana has been to reopen the state, not close it down," and that while "no one knows what the future of COVID-19 holds," it is "speculative, at best, that the Governor might reimpose the two-person restriction or a similar one"); *Martinko v. Whitmer*, 465 F. Supp. 3d 774, 777 (E.D. Mich. June 5, 2020) ("Plaintiffs' assertion that there is a good chance that these restrictions will come back is pure speculation and does not suffice to avoid the conclusion that their request for [] relief is moot."). Accordingly, the "capable of repetition" exception does not apply here.

Because they are inapposite, the cases cited by Plaintiffs do not alter this conclusion. Specifically, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court rejected the argument that challenges to New York's gathering limitations were moot. 141 S. Ct. 63 (2021). "[I]n that case, the governor had not removed all capacity limitations, and the possibility that a stricter restriction could apply remained likely." *Illinois Republican Party*, 2021 WL 4077624, at *3 (citing *Roman Catholic Diocese*, 141 S. Ct. at 68 ("The Governor regularly changes the classification of particular areas without prior notice. If that occurs again, the reclassification will almost certainly bar individuals in the affected area from attending services before judicial relief can be obtained.")). Similarly, in *Tandon v. Newsom*, the relevant officials had changed the restrictions on gatherings "shortly after" the plaintiffs filed their challenge, "the previous restrictions remained in place," and "officials with a track record of 'moving the goalposts'

29

retain[ed] authority to reinstate those heightened restrictions at any time." 141 S. Ct. 1294, 1296 (2021). In contrast here, all restrictions on business operations, including Plaintiffs' recreational facilities, ended as of July 1, 2021, and Defendants have "no track record of 'moving the goalposts' in a way that places [Plaintiffs] under a constant threat of renewed [restrictions on their facilities]." *Hawse*, 7 F. 4th at 693. Accordingly, in this case, "despite the surge in cases, no credible threat exists as to the[] reinstatement" of the restrictions that Plaintiffs challenge in this action. *Illinois Republican Party*, 2021 WL 4077624, at *3.

Nor do Plaintiffs argue, or does the Court find, that the "voluntary cessation" exception to the doctrine of mootness applies here. For the reasons discussed above, Defendants have assured the Court that the challenged restrictions cannot reasonably be expected to recur. Further, "none of the circumstances surrounding the voluntary lifting of restrictions indicate[s] the type of manipulative behavior the voluntary-cessation exception is meant to address." *Let Them Play MN v. Walz*, 21-cv-79, 2021 WL 3741486, at *6 (Aug. 24, 2021). Defendants are cognizant of the "economic toll" that the earlier restrictions took on businesses, Doc. 39 at 6, and have shifted their strategy away from such restrictions toward mask and vaccine mandates, not "to evade judicial review in this case," but rather to use the most effective means to stem the spread of COVID-19, in keeping with CDC guidance and the state's progress on vaccine administration. *Let Them Play MN v. Walz*, 2021 WL 3741486, at *6. There is thus no evidence to indicate that Defendants intend to reimpose business and travel restrictions; accordingly, the alteration of Defendants' earlier policies moots Plaintiffs' attack on those policies. *Rio Grande Silvery Minnow*, 601 F.3d at 117.

Admittedly, "there is always some uncertainty about the future course of the pandemic." *Let Them Play v. Walz*, 2021 WL 3741486, at *7 (citation omitted). The emergence of the Delta

30

and Omicron variants have "presented new concerns and inspired new public-health measures." *Id.* Nonetheless, the fact "that the government once imposed a particular COVID restriction does not necessarily mean that litigation over a defunct restriction presents a live controversy in perpetuity." *Hawse,* 7 F. 4th at 692. "[F]inding a live controversy would require both scientific and political speculation – *i.e.*, that the pandemic will proceed in a particular way, and that [New Mexico's] political branches will decide to reimpose the particular restrictions challenged in this case." *Let Them Play v. Walz*, 2021 WL 3741486, at *7. Faced with no more than such a "speculative contingency," *Rio Grande Silvery Minnow*, 601 F.3d at 117, the "better answer" is to find Plaintiffs' claims to be moot. *Let Them Play v. Walz*, 2021 WL 3741486, at *7. Accordingly, neither Defendants' voluntary cessation of the Challenged Orders, nor the "mere possibility" that Defendants might change course on their current pandemic strategies, works to enliven the moot controversy presented in this action.[4] *Rio Grande Silvery Minnow*, 601 F.3d at 117.

## CONCLUSION

As set forth herein, it would be futile to grant Plaintiffs leave to amend the SAC either to add a damages claim against Defendants in their individual capacity or to add a takings claim against Defendants (in any capacity). Accordingly, the Court will not grant Plaintiffs leave to amend the SAC. Further, no live controversy remains in this action because none of the

---

[4] The Court is aware that another Court in this District reached a contrary conclusion. *See ETP Rio Rancho Park v. Lujan-Grisham*, 21-cv-92, 2021 WL 4478383, at *31-32 (D.N.M. Sept. 30, 2021) (holding that "because the emergency remains ongoing and the State continues to issue PHOs," the issue in the case before it, namely restrictions on trampoline parks, remained live). Several months have passed since the *ETP* decision, and while the emergency does indeed remain ongoing, none of the subsequent orders issued by Defendants has imposed business restrictions. Given the record as it has developed since *ETP*, the Court finds that the weight of authority counsels against finding that the controversy here remains live.

31

Challenged Orders remains in effect, and neither the "capable of repetition" exception nor the "voluntary cessation" exception to the doctrine of mootness applies here.  Accordingly, the Court must dismiss this action for lack of subject matter jurisdiction.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Plaintiffs' 2nd Amended Complaint [Doc. 17] is **GRANTED** and Plaintiffs' Opposed Second Motion to File Third Amended Complaint [Doc. 37] is **DENIED**.

DATED this 17th day of February 2022.

_____
MARTHA VÁZQUEZ
Senior United States District Judge

Attorneys for Plaintiffs
Jared Robert Vander Dussen
A. Blair Dunn
Western Agriculture, Resource and Business Advocates, LLP

Attorneys for Defendants
Holly Agajanian
Kyle P Duffy
Maria S. Dudley
Office of the Governor Michelle Lujan Grisham